## In re DOYLE.

District Court, S. D. New York.
May 27 and June 9, 1930.

Charles H. Tuttle, U. S. Atty., of New York City, for the presentment.

Messrs. Talley & Lamb, of New York City (Alfred J. Talley and Samuel Falk, both of New York City, of counsel), for witness.

WOOLSEY, District Judge.

I. The six questions which I am asked to require the witness to answer and his attitude in regard to them are as follows:

"1. Q. I asked you a question yesterday morning which was in substance this: First of all, did you split any of the fee you got from Lottie Cutler with anyone else? A. I refuse to answer that question on the ground it would tend to incriminate me due to the

fact that District Attorney Tuttle is conducting an income tax investigation, my income tax investigation.

"2. Q. Are you now prepared to furnish us with the amounts of compensation which you received from the various persons you represented before the Board of Standards & Appeals during 1929? A. I refuse to do that on the ground it would tend to incriminate me.

"3. Q. Are you willing to tell us if we take this list of your clients you gave us the other day what compensation you received from each and in what form? A. I refuse to do that on the same ground.

"4. Q. Did you at one time make application to amend your income tax return? A. I refuse to answer that on the same ground.

"5. Q. Did you ever split a fee which you had received for work done before the Board? A. I refuse to answer that on the same ground.

"6. Q. Did you ever give a portion of your fee to any public official? A. I refuse to answer that on the same ground."

■ II. The test to be applied is whether the witness has a reasonable cause to apprehend danger to himself from a direct answer to the questions as propounded. Mason v. United States, 244 U. S. 362, 367, 37 S. Ct. 621, 61 L. Ed. 1198.

■ The duty of the witness is to answer frankly and directly until some question is propounded which under the above test might tend to self-incrimination. O'Connell v. United States (C. C. A. 2) 40 F.(2d) 201.

In dealing with a situation like this, therefore, I must take the questions just as they are asked and determine whether the witness must answer them in that form. I am not concerned with remote possibilities of danger to the witness which might arise if these questions should be followed by other questions of a more embarrassing kind.

It must be determined now only whether truthful answers to these questions would bring the witness within the zone of reasonable danger of self-incrimination.

III. 1. I think that the witness has already answered the second and third questions as they are now phrased, and therefore shall not require any further answers to these two questions.

2. The first and fifth questions are in pari materia. The proper answer to them is either "Yes" or "No."

■ Such an answer could not involve the witness in any zone of reasonable danger of self-incrimination under the provisions of the Federal Income Tax Law for information returns and the penalties imposed for failure to make such returns, 26 USCA §§ 2146 and 2148, or the similar provisions of the New York Income Tax Law (Tax Law N. Y. [Consol. Laws, c. 60], § 366, subd. 2, and section 376, subd. 4), if those are to be considered in a federal proceeding.

Further questions are therefore required before the witness is entitled to claim his privilege.

I, accordingly, instruct the witness to answer the first and fifth questions.

■ 3. As to the fourth question, I do not think there is any possibility whatever of self-incrimination in a "Yes" or "No" answer. Therefore I instruct the witness to answer the fourth question.

■ 4. As to the sixth question, I think it might involve the witness in probable danger of self-incrimination, because, as it is now phrased, it inquires whether he ever gave a portion of his fee to "any public official." That is broad enough to cover giving part of his fee to a public official of the federal government as well as to a public official of the state of New York.

If, for example, the witness had given part of a fee to some one connected with the Federal Income Tax Department, he would have been guilty of an offense against the United States, and I do not think he should be required to answer this question.

I therefore sustain the privilege of the witness with regard to the sixth question.

■ 5. Whether the witness could claim his privilege against self-incrimination under the Fifth Amendment of the United States Constitution, in a federal proceeding such as this, on the ground that an answer might incriminate him under the state laws of the state in which the federal court is sitting, is discussed in the following cases in the Supreme Court: United States v. Saline Bank, 1 Pet. 100, 103, 7 L. Ed. 69 (1828); Brown v. Walker, 161 U. S. 591, 608, 626, 16 S. Ct. 644, 40 L. Ed. 819 (1896); Ballmann v. Fagin, 200 U. S. 186, 195, 26 S. Ct. 212, 50 L. Ed. 433 (1906); Hale v. Henkel, 201 U. S. 43, 68, 26 S. Ct. 370, 50 L. Ed. 652 (1906).

The converse proposition as to self-incrimination under the federal law by being forced to answer a question in a state court proceeding is dealt with in Jack v. Kansas,

199 U. S. 372, 381, 382, 26 S. Ct. 73, 50 L. Ed. 234, 4 Ann. Cas. 689 (1905).

I think that a fair summary of the situation is to say that in Hale v. Henkel and Brown v. Walker, although the question of self-incrimination under state statutes was mentioned, the decisions of the court in both cases was based on the ground that the immunity granted by the federal statutes involved therein was a full immunity which had to be recognized in the state courts because federal statutes are the controlling law of the land under the sixth article of the Constitution. Consequently the observations by the court dealing with the question whether the witness could claim that by answering the question to which he objected, he might be incriminated under state law, were really not necessary to the decisions.

When the situation was reversed in Jack v. Kansas and the state law giving immunity was involved, it was held that the question of a witness incriminating himself under a federal statute was too remote in view of the subject-matter under inquiry, but it was intimated, 199 U. S. 372, at page 380, 26 S. Ct. 73, 50 L. Ed. 234, 4 Ann. Cas. 689, that, if there was a real danger of federal prosecution, the witness should be protected in the state court under the Fourteenth Amendment.

In United States v. Saline Bank, 1 Pet. 100, at page 104, 7 L. Ed. 69, Chief Justice Marshall summarized the situation as follows:

"This is a bill in equity for a discovery and relief. The defendants set up a plea in bar, alleging that the discovery would subject them to penalties under the statute of Virginia. The Court below decided in favor of the validity of the plea, and dismissed the bill. It is apparent that in every step of the suit, the facts required to be discovered in support of this suit would expose the parties to danger. The rule clearly is, that a party is not bound to make any discovery which would expose him to penalties, and this case falls within it. The decree of the Court below is therefore affirmed."

In Ballmann v. Fagin, 200 U. S. 186, at page 195, 26 S. Ct. 212, 213, 50 L. Ed. 433, Justice Holmes said:

"The subject under investigation, according to the government's statement, was the criminal liability of some employee of a national bank from the vaults of which a large amount of cash had disappeared. The book very possibly may have disclosed dealings with the person or persons naturally suspected, and, especially in view of the charges that Ballmann kept a 'bucket shop,' dealings of a nature likely to lead to a charge that Ballmann was an abettor of the guilty man. If he was, he was guilty of a misdemeanor under Rev. Stat. § 5209 [12 USCA § 592] and no more bound to produce the book than to give testimony to the facts which it disclosed. Boyd v. United States, 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746; Counselman v. Hitchcock, 142 U. S. 547, 12 S. Ct. 195, 35 L. Ed. 1110.

"Not impossibly Ballmann took this aspect of the matter for granted, as one which would be perceived by the court without his disagreeably emphasizing his own fears. But he did call attention to another, less likely to be known. As we have said, he set forth that there were many proceedings on foot against him as party to a 'bucket shop,' and so subject to the criminal law of the state in which the grand jury was sitting. According to United States v. Saline Bank, 1 Pet. 100, 7 L. Ed. 69, he was exonerated from disclosures which would have exposed him to the penalties of the state law. See Jack v. Kansas (decided this term), 199 U. S. 372, 26 S. Ct. 73, 50 L. Ed. 234, 4 Ann. Cas. 689. One way or the other we are of opinion that Ballmann could not be required to produce his cash book if he set up that it would tend to criminate him."

I feel that I am supported in my belief that the question may fairly be considered not to have been finally passed on by the Supreme Court, by the fact that in the case of Vajtauer v. Commissioner of Immigration, 273 U. S. 103, 113, 47 S. Ct. 302, 71 L. Ed. 560 (1927), Mr. Justice Stone, in giving the opinion of the court, after holding that Vajtauer had not raised his claim of privilege in a timely fashion, said at page 113 of 273 U. S., 47 S. Ct. 302, 306:

"This conclusion makes it unnecessary for us to consider the extent to which the Fifth Amendment guarantees immunity from self-incrimination under state statutes, or whether this case is to be controlled by Hale v. Henkel, 201 U. S. 43, 26 S. Ct. 370, 50 L. Ed. 652; Brown v. Walker, 161 U. S. 591, 608, 16 S. Ct. 644, 40 L. Ed. 819. Compare United States v. Saline Bank, 1 Pet. 100, 7 L. Ed. 69; Ballmann v. Fagin, 200 U. S. 186, 195, 26 S. Ct. 212, 50 L. Ed. 433." Also see McCarthy v. Arndstein, 262 U. S. 355, 360, 43 S. Ct. 562, 67 L. Ed. 1023.

The rule laid down in United States v. Saline Bank and in Ballmann v. Fagin as to self-incrimination under state law in federal proceedings was that followed in this district

by Judge Addison Brown in Re Feldstein (D. C.) 103 F. 269, 271 (1900), and by Judge Adams in Re Kanter (D. C.) 117 F. 356, 357 (1902).

If, therefore, from its context the sixth question be considered as applying only to state officials, the claim of privilege would, I think, still be maintainable by the witness.

I have discussed the question of self-incrimination under state law in some detail, not only because it has been argued at some length herein, both orally and in the briefs of counsel for both parties, but also because it is a question which, even if it is not necessarily raised now, will probably have to be directly met in case the examination of Dr. Doyle proceeds along expectable lines.

On Second Presentment by Grand Jury Asking that Witness be instructed to Answer Certain Questions which He Claims would Tend to Incriminate Him.

After my memorandum of May 27, 1930, in which I instructed the witness to answer certain questions, he was further interrogated and answered according to my instructions. On June 2, 1930, he was again brought before me, and, after full argument, it was ruled that he must answer the question as to whether he split any of the fees he received for his practice before the Board of Standards and Appeals with any other person.

Accordingly, it was agreed that he would answer that question.

Decision was reserved whether he would have to answer further questions as follows:

"1. With what persons did you split such fees?"

"2. How much did you give to each of such persons?"

To determine whether the witness should be required to answer these questions it became necessary to consider the somewhat unusual situation which exists in his case.

That situation, for the purpose of this opinion, may be summarized as follows:

The witness filed his income tax returns for the years 1922, 1923, and 1924. Owing to some publicity in which he had become involved, he apparently felt that these income tax returns needed revision, and, accordingly, on June 6, 1925, he filed with the collector of internal revenue at Brooklyn certain amended returns for the years 1922, 1923, and 1924, which were stated to have been filed without prejudice.

With his amended returns he paid a considerable sum of money which was supposed to cover all the taxes which he should have paid during the years above mentioned.

On January 8, 1926, he wrote a letter, which was verified before a notary public, to the collector of internal revenue. This letter constituted at once an application for a further hearing on his taxes, and also a claim for a refund of some of the taxes paid under his amended return.

I am informed also that on or about August 18, 1926, Dr. Doyle filed a formal sworn claim for such refund, that as a result of these proceedings his claim for refund was recognized by the Commissioner of Internal Revenue on October 8, 1926, and that later, some time in 1927, a refund was made to him in three separate checks for the overpayment of his taxes for 1922, 1923, and 1924.

The United States attorney, under these circumstances, makes several contentions.

I. The first of these contentions is that by the filing of amended income tax returns, followed by a sworn application for refund, the witness waived his right to claim privilege against self-incrimination under the Fifth Amendment, if interrogated on matters concerning his income taxes.

It is claimed that the situation is similar in its effect to the situation which would have existed if Dr. Doyle had taken the stand in the trial of a suit against the United States, and had given sworn testimony similar in effect to the sworn application for refund which he has already given. In such a case it is claimed that Dr. Doyle could not claim his privilege on cross-examination.

The United States cites, as a basis for this contention that filing income tax returns is a waiver of the privilege, the cases of United States v. Sullivan, 274 U. S. 259, 47 S. Ct. 607, 71 L. Ed. 1037, 51 A. L. R. 1020, and Vatjauer v. Commissioner of Immigration, 273 U. S. 103, 47 S. Ct. 302, 71 L. Ed. 560.

I do not think that these cases go far enough to establish the government's contention.

In the Sullivan Case it was held that a man who made his income by contraband traffic in liquor was bound to file an income tax return, and that he had the *right* in that return to raise a question of privilege as to whether his report of the sources of his income, or of money used in bribery, would tend to incriminate him. The court did not say, however, that a man must raise such a point on his income tax return or else be deemed to have waived it.

The Vatjauer Case was a case in which the privilege was waived, for there the deportee, in a writ of deportation proceeding, did not raise his privilége during the course of his examination before the immigration inspector, but first invoked it on appeal.

I think that the case of Arndstein v. McCarthy, 254 U. S. 71, 41 S. Ct. 26, 65 L. Ed. 138, further heard and reaffirmed, 254 U. S. 379, 41 S. Ct. 136, 65 L. Ed. 314, and McCarthy v. Arndstein, 262 U. S. 355, 43 S. Ct. 562, 67 L. Ed. 1023, are decisions which show that the government's contention has already, in effect, been overruled.

In the first of these cases, Arndstein v. McCarthy, the District Court here had refused to issue a writ of habeas corpus petitioned for by a bankrupt who had refused to answer a long list of questions propounded to him under section 21a of the Bankruptcy Act (11 USCA § 44(a), on the ground of his constitutional privilege, and thereafter had filed, by direction of the court, sworn schedules to show his assets and liabilities. When asked concerning these, he again set up his constitutional privilege, and thereupon was held in contempt and sent to jail.

The Supreme Court held that he should have had a writ of habeas corpus. The case was brought to their attention a second time during the same term by the trustee in bankruptcy, Id., 254 U. S. 379, 41 S. Ct. 136, 65 L. Ed. 314, with the same result.

Subsequently the writ of habeas corpus was granted, McCarthy v. Arndstein, 262 U. S. 355, 43 S. Ct. 562, 67 L. Ed. 1023, and the bankrupt discharged from custody by the District Court.

Mr. Justice Sanford, holding that this was a correct decision, discussed the question of self-incrimination in extenso, and emphasized the fact that, until a witness had voluntarily admitted his guilt of a criminal offense, he was entitled to stop short at any point where the questions indicated the probability of his being incriminated. This rule was held to apply after schedules, which did not in and of themselves constitute an admission of crime, had been filed by order of a bankruptcy court.

I think that the analogy which the government seeks to make between the situation now existing and the situation which would have existed if Dr. Doyle had taken the stand in a trial of a case which he had brought against the government is not sound.

I do not believe that, if Dr. Doyle had filed a sworn complaint or petition in the Court of Claims, for example, against the government, he could then have been put on the stand by the government and examined irrespective of whether the question asked of him would tend to incriminate him or not. If he did not take the stand in his own behalf, he might, of course, lose his suit, but he would not have lost his privilege.

■ I hold, therefore, that by filing his amended return and his sworn application for refund of taxes Dr. Doyle did not waive his privilege.

■ II. It is settled law, and common ground between the parties here, that, after the statute of limitations under which a witness can be prosecuted for a crime has passed, he cannot plead his constitutional privilege against self-incrimination, because there is no longer any danger to him. Hale v. Henkel, 201 U. S. 43, 57, 26 S. Ct. 370, 50 L. Ed. 652; Brown v. Walker, 161 U. S. 591, 598, 16 S. Ct. 644, 40 L. Ed. 819.

I have already held, in my memorandum of May 27, 1930, that under the Fifth Amendment Dr. Doyle could claim his privilege against self-incrimination in a federal proceeding such as this on the ground that an answer might incriminate him under the state laws of the state in which the federal court was sitting.

It is necessary, therefore, to determine what is the period of limitation in respect of any crime, federal or state, for which it is reasonably possible that Dr. Doyle can be indicted.

Both parties agree that the bribing of a public official is a felony under New York law, New York Penal Law (Consol. Laws, c. 40), § 371, and the New York state statute of limitations against felonies other than murder is five years, New York Code of Criminal Procedure, § 142.

In respect of any federal crime possibly involved, however, we have here a very unusual situation, for here the prosecutor is claiming a three-year statute of limitation in order to open up a wide zone of free inquiry, and the attorneys for the witness are claiming a six-year period of limitation in order to narrow that zone as much as possible.

It is observable in connection with this contention that it is a somewhat simpler matter, after an indictment has been found, to determine the question of the statute of limitations applicable to it than it is to determine what limitation would be applicable to

any probable crime for which the witness is in the danger of indictment.

The federal statutes of limitation under consideration are title 18, U. S. Code, § 582 (18 USCA § 582), and title 18, U. S. Code, § 585 (18 USCA § 585).

Title 18, § 582, reads:

"*Offenses not capital.* No person shall be prosecuted, tried, or punished for any offense, not capital, except as provided in section 584 of this title, unless the indictment is found, or the information is instituted, within three years next after such offense shall have been committed; Provided, however, That in offenses involving the defrauding or attempts to defraud the United States or any agency thereof, whether by conspiracy or not, and in any manner, and now indictable under any existing statutes, the period of limitation shall be six years. * * * *"

Title 18, § 585, reads:

"*Crimes under Internal Revenue Laws.* No person shall be prosecuted, tried, or punished for any of the various offenses arising under the internal revenue laws of the United States unless the indictment is found or the information instituted within three years next after the commission of the offense: Provided, That for offenses involving the defrauding or attempting to defraud the United States or any agency thereof, whether by conspiracy or not, and in any manner, the period of limitation shall be six years, but this proviso shall not apply to acts, offenses, or transactions which were barred by law on June 2, 1924. * * * *"

The first of these statutes was the successor of the Revised Statutes, § 1044, by way of the Act of November 17, 1921, and the second one was first enacted on July 5, 1884, and after various amendments finally emerged in its present form as section 1110(a) of the Revenue Act of 1926, whence it was taken for the United States Code.

In this connection, the government calls my attention to the case of United States v. Noveck, 271 U. S. 201, 46 S. Ct. 476, 70 L. Ed. 904; United States v. McElvain, 272 U. S. 633, 47 S. Ct. 219, 71 L. Ed. 451, and the construction of the McElvain Case in Miller v. United States (C. C. A.) 24 F.(2d) 355, 360, and contends that the statute of limitations in respect of any federal crime for which Dr. Doyle could be indicted in connection with the situation before the grand jury is three years only, whether he be indicted for a conspiracy or not.

■ In view of the decision in the McElvain Case, I think that the statute of limitations

applicable to a conspiracy to commit a federal crime depends on the statute applicable to the substantive offense which is the object of the conspiracy.

The rationale of such a holding is perfectly obvious, because, if it were otherwise, a prosecuting officer might, by making his indictment count in conspiracy, increase the statute of limitations, and, in effect, hold a defendant for a crime which had already been outlawed. Miller v. United States (C. C. A.) 24 F.(2d) 353; Falter v. United States (C. C. A.) 23 F.(2d) 420; Weinhandler v. United States (C. C. A.) 20 F.(2d) 359; Evans v. United States (C. C. A.) 11 F.(2d) 37, are examples of cases involving substantive crimes, the object of which was to defraud the United States. Under the provisos of sections 582 and 585 above set forth, the statute of limitations for such crimes is six years, whether the fraud practiced was under the internal revenue laws or not.

Therefore, if Dr. Doyle was guilty of making false claims for refund in his letter of January 6, 1926, and his subsequent formal verified claim for refund, he might still be indicted for such false affidavit under title 18, U. S. Code, § 80 (18 USCA § 80), or, if his attorney or his accountant conspired with him in making up this sworn claim, he might be indicted for conspiracy to defraud the United States under title 18, U. S. Code, § 83 (18 USCA § 83), or under the General Conspiracy Statute, title 18, U. S. Code, § 88 (18 USCA § 88).

The net result is that there is not any free zone of inquiry, for what Dr. Doyle may have done in 1922, 1923, and 1924 with regard to his income tax is drawn forward into the danger zone by his amended returns and his sworn application for refund of his taxes.

Whether Dr. Doyle should be instructed to answer any question asked him about his income taxes and matters relevant thereto since 1922 depends, therefore, on whether an answer to it would tend to incriminate him.

■ Whether an answer to a question would tend to incriminate a witness depends on whether, if he gave a true and responsive answer to the question asked, that answer would form part of a chain of evidence which might tend to incriminate him. Cf. Ex parte Irvine (C. C.) 74 F. 954, 960, 963.

It is perfectly obvious that a responsive answer to the question with whom he split fees during the years mentioned would be a list of names, and a list of names would not tend to incriminate Dr. Doyle.

The question is, not whether by his an-

swer the prosecutor would be able perhaps to get leads to other witnesses, but whether an answer to the particular question would put the witness in danger. I do not think an answer to these questions could tend to incriminate the witness.

Consequently, I order Dr. Doyle to answer the questions as to the persons with whom he split fees in 1922, 1923, and 1924.

If the same question is asked about the period covered by the last five years, it must exclude public officials because of the state statute of limitations above mentioned.

If asked about the period covered by the last three years, I shall sustain the objection of the witness, because income tax crimes for those years have not been outlawed, and it might be that a true answer would show that he had not filed the information returns required by section 1114a of the Revenue Act of February 26, 1926 (26 USCA § 1265).

If the question is asked him as to the amounts which he paid to the several persons with whom he split fees during 1922, 1923, and 1924, I shall sustain his constitutional privilege to refuse to answer because a true answer as to those amounts might be at variance with the amounts stated in his application for refund, and, consequently, might tend to show that he had sought to defraud the United States by a false affidavit.

NOTE: Thereafter, on June 9th, Dr. Doyle was again brought before me on presentment by the grand jury because he had refused to answer the questions:

"With whom did you·split fees in 1922?

"With whom did you split fees in 1923?

"With whom did you split fees in 1924?"

The witness was instructed by me to answer these questions, and refused to do so on advice of his counsel. I therefore held him in contempt and sentenced him to be imprisoned in the United States Detention Headquarters for thirty days or until he should have answered the questions as he was instructed to do.